1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROY L. GEORGE, JR.,

11                   Petitioner,              No. CIV S-10-3058 GGH P
             vs.
12
     PEOPLE OF THE STATE OF
13   CALIFORNIA,

14                   Respondent.              ORDER

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  This case is before the undersigned pursuant to both

19   parties' consent.  Docs. 5, 9.  Petitioner was found guilty by a jury of attempted robbery, assault

20   and elder abuse.  He was sentenced to eleven years in prison.

21              Petitioner raises four claims in the instant petition: 1) the trial court erred by

22   denying admission of excited utterances; 2) the trial court erred by not granting use immunity to

23   a potential defense witness; 3) sufficiency of the evidence; and 4) sentencing error.

24              After carefully considering the record, the court orders that the petition be denied.

25   \\\\

26   \\\\

II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an

1   *unreasonable* application of federal law is different from an *incorrect* application of federal

2   law.'" Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120

3   S.Ct. 1495 (2000).  "A state court's determination that a claim lacks merit precludes federal

4   habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

5   decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

6   Accordingly, "a habeas court must determine what arguments or theories supported or . . could

7   have supported[] the state court's decision; and then it must ask whether it is possible fairminded

8   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

9   decision of this Court." Id.  "Evaluating whether a rule application was unreasonable requires

10  considering the rule's specificity.  The more general the rule, the more leeway courts have in

11  reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the stringency of this

12  standard, which "stops short of imposing a complete bar of federal court relitigation of claims

13  already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

14  strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.,

15  citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

16          The undersigned also finds that the same deference is paid to the factual

17  determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

18  presumed to be correct subject only to a review of the record which demonstrates that the factual

19  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

20  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

21  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

22  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

23  same record could not abide by the state court factual determination.  A petitioner must show

24  clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

25  U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

26  \\\\

1        The habeas corpus petitioner bears the burden of demonstrating the objectively

2   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

3   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

4   show that the state court's ruling on the claim being presented in federal court was so lacking in

5   justification that there was an error well understood and comprehended in existing law beyond

6   any possibility for fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  "Clearly

7   established" law is law that has been "squarely addressed" by the United States Supreme Court.

8   Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

9   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

10  Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

11  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

12  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

13  established law when spectators' conduct is the alleged cause of bias injection).  The established

14  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or

15  other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

16  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

17        The state courts need not have cited to federal authority, or even have indicated

18  awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct.

19  at 365.  Where the state courts have not addressed the constitutional issue in dispute in any

20  reasoned opinion, the federal court will independently review the record in adjudication of that

21  issue.  "Independent review of the record is not de novo review of the constitutional issue, but

22  rather, the only method by which we can determine whether a silent state court decision is

23  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

24  III.  Background

25        The California Court of Appeal set forth the following factual summary that the

26  court adopts below.

A jury found that [petitioner] and [co-defendant] Dante McFall assaulted and attempted to rob 74-year-old newspaper carrier Fredrick Bentley as Bentley was delivering newspapers in the early morning hours of July 31, 2005.

[. . .]

Seventy-four-year-old Bentley was delivering newspapers for the Sacramento Bee the morning of July 31, 2005.  He testified that as he was returning to his truck from delivering a paper to the Plazas apartment complex, he saw someone in his truck.  Bentley made a "smart remark" to the person he thought was trying to steal the truck, then he "got whacked from behind" and recalled nothing else until he was in the hospital.

Bentley's testimony differed in several respects from that of the three young men who, with the defendants and others, had gathered outside the Plazas that night (Isaac Butler, Germaine O'Neil, and Derrick Smith), and who testified at trial.  Two, Butler and Smith, were given immunity for their testimony in court, and O'Neil waived his Fifth Amendment rights as part of a guilty plea.  Their stories were largely in agreement.

Butler, [petitioner], and Roydrick Houston were standing and talking outside Houston's apartment complex, the Plazas.  O'Neil arrived, driving a red Honda. Defendant McFall was in the front passenger seat of the Honda, and Greg Frye and Derrick Smith were seated in the back.

Houston and [petitioner] walked over to the red Honda to talk to the four in the car.  The group noticed Bentley exit his truck.  Houston told the group to steal the truck.  [Petitioner] went to the truck, saw that it was a manual transmission, and decided he was unable to drive it.  [Petitioner] returned to the group, never having entered the truck.  Houston then told the group to rob Bentley.  [Petitioner] went back to Bentley's truck, opened the door, and started talking to Bentley. Defendant McFall ran to the passenger side of Bentley's truck.  Houston then directed O'Neil to block Bentley's truck so he could not drive away.

Defendant McFall hit Bentley two or three times on the head.  Bentley got out of the truck, but McFall ran around to the driver's side of the truck and continued to hit Bentley in the face.  Bentley fell to the ground.  [Petitioner] stood over Bentley, as if he were going to go through Bentley's pockets.

As a result of the attack, Bentley suffered a fractured skull, a concussion, a laceration on the back of his head that required staples, four broken ribs, and bleeding on the brain.  The emergency room doctor described Bentley's head injury as potentially life threatening.

People v. George, 2009 WL 1244175, *1-2.

\\\\

\\\\

\\\\

IV.   <u>Argument & Analysis</u>

      Claim 1-<u>Excited Utterances</u>

      Petitioner argues that the trial court erred by failing to admit all the statements made by Roydrick Houston in a 911 call.

      <u>Legal Standard</u>

      The Supreme Court has reiterated the standards of review for a federal habeas court.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S.Ct. 475 (1991).  In <u>Estelle v. McGuire</u>, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions."  <u>Id</u>. at 67-68.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in state law."  <u>Id</u>. at 67, citing <u>Lewis v. Jeffers</u>, 497 U.S. 764, 110 S.Ct. 3092, 3102 (1990), and <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S.Ct. 871, 874-75 (1984) (federal courts may not grant habeas relief where the sole ground presented involves a perceived error of state law, unless said error is so egregious as to amount to a violation of the Due Process or Equal Protection clauses of the Fourteenth Amendment).

      The Supreme Court further noted that the standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."  <u>Id</u>. at 68.  The Court also stated that in order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness,"  <u>Id</u>. at 73, and that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.' "  <u>Id</u>. at 73.  Habeas review does not lie in a claim that the state court erroneously allowed or excluded particular evidence according to state evidentiary rules.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).

\\\\

Criminal defendants have a constitutional right to present relevant evidence in their own defense.  See Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted).  The Supreme Court has indicated that a defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment, see Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038 (1973), and from the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment, see Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967) (explaining that the right to compulsory process would be meaningless if the defendant lacked the right to use the witnesses whose presence he compelled).

However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules.  United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998).  In fact, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," id., and the Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury,"  Holmes v. South Carolina, 547 U.S. 319, 326, 126 S.Ct. 1727 (2006).  Evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. at 324, 547 U.S. 319, 126 S.Ct. 1727  (alteration in original) (internal quotation marks omitted); see also Scheffer, 523 U.S. at 315, 118 S.Ct. 1261 (explaining that the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense").  In general, it has taken "unusually compelling circumstances ... to outweigh the strong state interest in administration of its trials." Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983).

7

Analysis

This claim was brought in state court and denied in a reasoned decision by the California Court of Appeal, that also laid out the factual background.

[Petitioner] argues the trial court erred in excluding evidence of a 911 call Houston made after the attack. During the call Houston gave his address and requested an ambulance because the victim was "bleeding bad" and "he hecka old[.]"

However, when the operator tried to ask Houston what had happened, he was less than forthcoming. The operator asked if the victim told Houston what had happened, to which Houston replied, "Nah, I saw it out the-at my mom's house (unintelligible) and some dudes beat the shit out of him." Thereafter, Houston deflected the operator's query about what Houston had seen by telling her to "just bring an ambulance[.]" Finally, he became impatient and said, "This shit ain't-ya'll asking me hella questions. Why don't y'all just bring an ambulance?"

In response to [petitioner's] request to introduce the 911 tape,[FN] the trial court found the first part of Houston's 911 call qualified as an excited utterance exception to the hearsay rule, but that from the point of his response to the operator's question, "Did he say what happened to him[,]" the statements did not qualify as an excited utterance because Houston began to edit himself.

FN. The tape also contained the voice of someone identified as Tommy Champagne. [Petitioner] sought to introduce the entire tape, but his appeal addresses only the exclusion of Houston's statement.

[Petitioner] argues the tape of the conversation reveals no self-editing on Houston's part, that such a fact does not render the statement non-spontaneous, that the transcript of the call is inaccurate, and that nothing suggested Houston's statements were fabricated. [Petitioner] further argues the improper exclusion of the evidence was prejudicial because Houston's statement tended to show Houston never instructed anyone to rob Bentley, and because it tended to show the attempted robbery and assault were perpetrated entirely by the occupants of the red Honda or some other group.

Evidence Code section 1240 codifies the spontaneous declaration exception to the hearsay rule. A statement qualifies as a spontaneous declaration if: (1) there was an occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance was made before there was time to contrive and misrepresent, i.e., while the nervous excitement dominated and the reflective powers were in abeyance; and (3) the utterance related to the circumstance of the startling occurrence. (People v. Poggi (1988) 45 Cal.3d 306, 318.) Whether these requirements are satisfied is a question of fact vested in the discretion of the trial court, and we review the trial court's determination for abuse of discretion. (Ibid.)

The most important element in determining whether the statement is sufficiently reliable to be admitted as a spontaneous declaration is the mental state of the

8

declarant, i.e., whether the declarant made the statement without deliberation or reflection. (People v. Farmer (1989) 47 Cal.3d 888, 903, overruled on other grounds as noted in People v. Waidla (2000) 22 Cal.4th 690, 724, fn. 6.) The trial court's discretion is broadest when it makes this determination. (People v. Poggi, supra, 45 Cal.3d at p. 318.)

The trial court found that when the operator started asking Houston what had happened and the subject of the call switched from getting Bentley medical attention to trying to determine what had occurred, Houston's tone and rhythm indicated he began to edit himself. [Petitioner's] argument that every speaker decides what information to convey and what information to withhold is without merit. It was incumbent upon the trial court to determine whether Houston made the statement without deliberation or reflection. By saying Houston was editing himself, the trial court was simply expressing its determination that Houston was making the statement after deliberation or reflection, making the statement insufficiently reliable to qualify as an exception to the hearsay rule.

It is apparent from both the tape and the transcript that Houston did not want to answer any questions about what had happened. This alone supports the trial court's inference that any answers he gave to questioning on that subject would have been made after reflection.

[Petitioner's] claim that the trial court relied on an inaccurate transcript is without merit. It is apparent from the trial court's remarks, including that it was relying on the tone and rhythm of Houston's voice, that the court relied on the tape as well as the transcript.

We conclude it was well within the trial court's discretion to exclude evidence of the 911 call because it was not sufficiently reliable to qualify as a spontaneous declaration.

People v. George, 2009 WL 1244175, *2-3.

While the reasoning of petitioner's argument is not clear from the instant petition, a review of prior appeals brought by petitioner indicates that petitioner argues the trial court should have included the statement, "Nah, I saw it out the-at my mom's house (unintelligible) and some dudes beat the shit out of him," which would have rebutted the prosecution's theory that just one person beat the victim. [Notably, Houston's statement does not preclude petitioner from being one of the "some dudes."]

This is not a situation where the evidence appears fairly reliable, is critical to the defense, and its exclusion under state evidentiary laws exalted technicality over substance. While the evidence may have been useful to the defense in the abstract, it was not critical. It

9

1   would not be illogical to refer to assailants in the plural ("dudes"), when one of the "dudes"

2   [petitioner] had the task to distract the victim so that he could be pounced upon by the actual

3   beater.  Thus, the statement does not actually exonerate petitioner.

4            Moreover, the whole purpose of the state excited utterance analysis was to test its

5   reliability.  It was found to be highly suspect.  The cases which instruct that evidence should be

6   admitted regardless of the strictures of state evidentiary law do not apply where the evidence is of

7   low reliability.  The entire reason for permitting excited utterances into evidence relates to the

8   reliability occasioned by the speaker, having just witnessed a surprising event, has not had the

9   chance to design testimony.  In the latter case, the testimony is designed self-serving hearsay.

10  The state court's conclusion to this effect is not an unreasonable interpretation of the balancing

11  exhibited by the above cited Supreme Court authority.

12           Finally, Houston's culpability in the crime is apparent in that Houston's statement

13  was contradicted by the testimony of several eye witnesses and other statements that Houston

14  made.  Regardless if it was just one person who assaulted the victim or several, petitioner was

15  still culpable as an accomplice.[1]  To the extent petitioner argues Houston's statement was

16  exculpatory as it could point to another group of unidentified people committing the crime, any

17  such argument is meritless in the context of the evidence as a whole.

18           For all these reasons this claim is denied.

19           Claim 2-Use Immunity

20           Petitioner contends that the trial court erred when it refused to grant use immunity

21  to Roydrick Houston, so he could testify.  In the instant petition, petitioner alleges that the

22  prosecution planned on calling Houston as a witness but then chose not to after an investigator

23  sent by petitioner interviewed Houston.  Petition at 5.  This claim was brought in state court and

24  denied in a reasoned decision the California Court of Appeal.

25

26  [1] At trial the prosecution asserted that co-defendant McFall was the only person to attack
    the victim.

Houston asserted his Fifth Amendment privilege when called as a witness. [Petitioner] requested the trial court grant immunity to Houston. The trial court refused, finding Houston's statement would not be exculpatory, his testimony would not be essential, and the prosecution had a strong interest in not granting immunity to Houston.

[Petitioner] argues the denial of his motion to grant judicial immunity to Houston denied his rights to due process, to present a defense, and to confront the prosecution's case. We disagree.

Immunity is an executive, not a judicial function. (United States v. Duran (9th Cir. 1999) 189 F.3d 1071, 1087.) In People v. Hunter (1989) 49 Cal.3d 957, 973, the Supreme Court stated that "the Courts of Appeal of this state have uniformly rejected the notion that a trial court has the inherent power, in such circumstances, to confer use immunity upon a witness called by the defense." The court held that if such power existed, it would be limited to situations in which the defendant could show: (1) the testimony was clearly exculpatory, (2) the testimony was essential, and (3) there was no strong governmental interest countervailing against a grant of immunity. (Id. at pp. 973-974.)

In finding that Houston's testimony would not be exculpatory, the trial court noted that Houston had given seven separate statements. Houston also gave a statement to [petitioner's] investigator. Even though the trial court made all the statements a part of the record, only the statement to [petitioner's] investigator is contained in the record before us.

The trial court determined after reading all of the statements that Houston's testimony would not be exculpatory because he was not claiming that Bentley was beaten by a group, and because his statements were so inconsistent. Because evidence had been presented that Houston was calling the shots and because Houston's own statements were so inconsistent, the trial court found his testimony would not be essential because they would not be a "clarifying factor" for the jury. The trial court found the government had a strong interest in refusing immunity to Houston because he was a "major player" in the case, was a "shot caller," and still had liability.

[Petitioner] argues the inconsistency among Houston's various statements was not relevant to a determination that the proposed testimony would have been exculpatory. He argues that on the important points to his defense, i.e., that Houston never told anyone to rob the victim and that Houston claimed the responsibility for the attempted robbery rested solely with the occupants of the red Honda, Houston's statements were consistent. He argues the credibility of Houston would have been a determination for the jury to make. He claims that if the jury believed Houston never directed anyone to rob Bentley, there would have been no evidence of the conspiracy upon which the prosecution's case against him rested.

[Petitioner] argues the testimony was essential to solve the discrepancy between the testimony of Smith and O'Neil. Smith testified Houston told the others to rob Bentley, whereas O'Neil told the others to see if Bentley had any money. We see no discrepancy in the testimony of Smith and O'Neil, because both appear to have

testified that Houston was directing the others to steal Bentley's money.  Thus, the testimony was not essential to solve any discrepancy.

Further, we agree with the trial court that Houston's involvement as the instigator of the attempted robbery is a valid governmental reason for declining to grant Houston immunity.  The trial court's decision reflects the appropriate deference to prosecutorial discretion.

Thus, assuming Houston's credibility was not a basis on which the trial court could properly rely in determining whether the testimony was exculpatory, the testimony was not essential, and there was a strong governmental interest in not granting him immunity.  The trial court did not err in failing to grant immunity to Houston.

People v. George, 2009 WL 1244175, *3-4[2]

---

[2]The trial court then made the following ruling:
All right.  Well, I'm making some assumptions that the information regarding Roydrick Houston kind of being the shot caller on this case was available early on the case before there were any offers of discussions of immunity.

I am going to apply the federal evaluation of this.  I think that Conner acknowledged a couple of things, one is that granting of immunity really is the promise of the government, not of the judiciary, but the judiciary in extraordinary circumstances may step in if there's a risk of an unfair trial and due process is being violated.  And it sets out the criteria for making that evaluation.

Number one, that the statement defense seeks be exculpatory.  I should note for the record that counsel has given to me with everybody's agreement statements of Roydrick Houston on July 31st, 2005, at 5:21, to Murchie; July 31st at 5:35 to - - looks like Hoover; August 1st, around two - - August 1st, '05. To Hensley; August 2nd, '05, to - - looks like it's also Hensley; August 4th, '05, at 1300 to Curtin; August 4th to Hensley, and August 8th again to Hensley.  And I will make those part of my record.  I'll attach those counsel, Ms. Hart [for petitioner], to your motion.

It appears to me in reading all of those and the statement that Mr. Houston gave to [petitioner's] investigator that his - - he will not be exculpatory in this any regard.  He comes way off his four people beating [the victim] statement.  Not only by the time he's giving a statement to [petitioner's] investigator but also in August where he's making a statement to Detective Hensley.

Everybody must have known that if Houston were going to testify for anybody that he was going to take the Fifth.  And if he were going to take the Fifth, it would be necessary for the government to grant immunity for him to testify.  So I don't think the fact the government finally decided not to call him, if that is the case, is really determinative in this case unless the government has granted immunity to some people in order to serve their purpose and has purposely withheld immunity from other witnesses to present an unfair picture to the jury of this case.

So the second prong of that is, if Houston's statements were presented to the jury, I don't think

1    A. <u>There Exists No Established Supreme Court Authority Which Compels the Granting</u>

2    <u>of Use Immunity by a State</u>

3    The issue concerning a compelled grant of use immunity is a mixed question of

4    law and fact, and hence reviewed as a matter of law.  <u>Flores-Blanco</u>, 623 F. 3d 912, 617 (n.1)

5    (9th Cir. 2010).  Thus, in order to vacate a conviction because of the lack of compelled

6    immunity, petitioner must demonstrate that the decision was unreasonable pursuant to

7    _____

8    they're going to look to him to be the clarifying factor in this case.  Number one, because of what
     the evidence that's already been admitted regarding him and implying he's - - at least implying

9    that he's a shot caller in this case.  And secondly, that his statements are all over the board.  So it
     does not appear to me that he would be exculpatory.

10

11   In terms of whether the District Attorney is playing games with they give immunity to and who
     they do not, I will note that Issac Butler was a very minor player in this case.  And all the District
     Attorney would have been giving up in immunity would have been an accessory after the fact for

12   driving [petitioner] away.

13   Derrick Smith, to my reading of this, really didn't have much liability.  I don't think the DA was
     giving up much by giving him immunity.  The evidence here was he was not out of the car.

14

15   Germaine Oneil, he didn't really get immunity.  He pled guilty, and as part of that plea waived
     his Fifth Amendment Rights so that he would testify here.  So that really wasn't a negotiated
     situation.

16

17   As far as Houston was concerned, he was a major player in this.  He not only was a shot caller,
     according to competent and believable evidence, he still has liability on this.  He's never been
     charged.

18

19   When he took the deal on his other cases, there wasn't a Harvey Waiver on this, there was no
     preclusion to him being charged with this case.  So he has a strike out there waiting for him if he
     were prosecuted on this case.  Given that, it makes complete sense to me that there's a huge

20   government interest in not giving Mr. Houston immunity.

21   Also in measuring the two who did get immunity against Mr. Houston, who did not, it appears to
     me that this is a logical and not any kind of punitive ploy by the District Attorney.

22

23   As far as the second element of the Hunter examination that this witness be essential, there's
     really very little this witness would provide even if believed that other witnesses have not
     provided.

24

25   So in light of the heavy burden [petitioner] must carry in order to have the Court grant immunity,
     I will deny your request.

26   RT at 718-20.

13

1    established Supreme Court authority.  28 U.S.C. 2254(d)(1).  The Ninth Circuit has held that

2    there is no established Supreme Court authority requiring the grant of judicial immunity absent

3    prosecutorial misconduct.  This was even true pre-AEDPA, Allen v. Woodford, 395 F.3d 979,

4    996 (9th Cir. 2005), and no Supreme Court case has issued a holding on the issue to the

5    knowledge of the undersigned.  However, even if the issue here were whether a court can grant

6    the defense use immunity for its witnesses on account of prosecutor misconduct for one of the

7    defense witnesses, petitioner fares no better.

8            The lower federal courts have nearly uniformly found in federal criminal actions

9    that extraordinary situations, i.e., prosecutor misconduct, must exist in order to rise to the level

10   where due process requires the court to compel use immunity.

11        To require the district court, as a matter of due process, to compel use immunity
          for Fernandez, Flores–Blanco had to make two showings. First, he had to show
12        that Fernandez's anticipated testimony was relevant.  United States v. Straub, 538
          F.3d 1147, 1157 (9th Cir.2008).  Second, Flores–Blanco was required to show
13        either that:

14        (a) the prosecution intentionally caused [Fernandez] to invoke the Fifth
          Amendment right against self-incrimination with the purpose of distorting the
15        fact-finding process; or (b) the prosecution granted immunity to a government
          witness in order to obtain that witness's testimony, but denied immunity to
16        [Fernandez,] whose testimony would have directly contradicted that of the
          government witness, with the effect of so distorting the fact-finding process that
17        [Flores–Blanco] was denied his due process right to a fundamentally fair trial.

18   United States v. Flores- Blanco, 623 F.3d at 917 (9th Cir. 2010)

19   See also the pre-AEDPA case of Williams v. Woodford, 384 F.3d 567, 600 (9th Cir. 2004)

20   (applying the same test, and relying on prior, federal non-Supreme Court criminal cases.).

21           However, the undersigned cannot find where the Supreme Court has spoken to

22   this precise issue.  While there is such authority exploring the parameters of a state or federal

23   grant of use immunity vis-a-vis different sovereigns, see e.g., New Jersey v. Portash, 440 U.S.

24   450, 99 S.Ct. 1292 (1979), the Court has not spoken to the issue here.  The undersigned is not

25   alone in his conclusion.  See Salinas v. Horel, 2010 WL 477231 *14 (C.D. Cal. 2010).  The only

26   reference that the undersigned can find regarding a constitutionally compelled use immunity

1    appeared in the Portash case at footnote 6.  In referring to a previous case (Murphy v. Waterfront

2    Commn., 378 U.S. 52), the opinion provided: " The [Murphy] Court proceeded on the premise

3    that a State is required to provide at least use immunity, and held that such immunity would have

4    to be honored by the Federal Government."  However, a "premise" is far distant from a holding

5    of the court on a disputed issue.

6            It is not sufficient in the AEDPA context that lower courts have opined on what

7    the Constitution requires – the lower court holding must be derived from the unmistakable

8    holdings of  Supreme Court authority.  Wright v. Van Patten, supra; Casey v. Musladin, supra.

9    That the circuit courts have found that due process will in extraordinary situations, i.e.,

10   prosecutor misconduct, require the compelled grant of use immunity, the Supreme Court has not.

11   "[Petitioner's] reliance on Ninth Circuit or other circuit authority is misplaced.  He must show

12   that the California Court of Appeal decision was "contrary to, or involved an unreasonable

13   application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C.

14   § 2254(d)(1) (emphasis in original). Arrendondo v. Ortiz, 365 F.3d 778, 782 (9th Cir. 2004).  Of

15   interest here, Arredondo involved a petitioner's assertion that the court should have ordered a

16   witness to testify after that witness invoked the Fifth Amendment on collateral matters.

17   Petitioner herein cites no established Supreme Court authority for his proposition regarding the

18   compelled grant of use immunity and that is the end of the AEDPA question.  A denial is

19   mandated on this issue.

20           Claim 3-Sufficiency of the Evidence

21           Petitioner next contends that there was insufficient evidence for the jury to find

22   him guilty of conspiracy.

23           Legal Standard

24           When a challenge is brought alleging insufficient evidence, federal habeas corpus

25   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

26   most favorable to the prosecution, no rational trier of fact could have found "the essential

elements of the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). <u>Jackson</u> established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. <u>U.S. v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. <u>Id</u>., citing <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" <u>Id</u>., quoting <u>Jackson</u>, 443 U.S. at 326, 99 S.Ct. 2781.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" <u>Id</u>., quoting <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." <u>Id</u>

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the <u>Jackson</u> standard in the absence of an unreasonable determination. <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir. 2005).

<u>Analysis</u>

This claim was also denied in a reasoned opinion by the state court.

[Petitioner] argues there was insufficient evidence to prove a conspiracy because the only evidence of a conspiracy was inherently unreliable. Echoing his prior argument, he claims the sole evidence of a conspiracy was the testimony of Smith, who stated Houston "was like, rob that fool." He argues Smith's testimony was suspect because Smith initially lied to police, changed his story only when others

implicated him, gave an entirely exculpatory statement, and gave a description of events that was inconsistent with that of other witnesses.

As previously stated, we disagree with [petitioner's] characterization that Smith's testimony was materially different from O'Neil's regarding Houston's direction of the conspiracy.  Neither Smith nor O'Neil appears to have been quoting Houston directly.  Smith said Houston "was like, rob that fool," after which [petitioner] walked over to Bentley's truck.  O'Neil testified Houston "told us to go, go see if the old man got some money in his pockets[,]" after which [petitioner] walked over to Bentley's truck.  Presumably, Houston was not directing the others to ask Bentley politely if he had any money, but to take whatever money he had.  Thus, Smith was not the only witness to testify to a conspiracy to rob Bentley.

As to the other reasons for questioning the credibility of Smith's testimony, the jury was presented with the facts that he initially lied to police and that he changed his story after being told others had implicated him.  The jury was well aware that his statement tended to exonerate himself and that it was inconsistent in some respects with the testimony of the other witnesses.

It is the exclusive province of the jury to determine a witness's credibility.  (People v. Barnes (1986) 42 Cal.3d 284, 303.)  Our job is to determine the evidence is reasonable in nature, credible, and of solid value.  (Ibid.)  In our determination of credibility, we look to see if the testimony is "'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.' " (People v. Hovarter (2008) 44 Cal.4th 983, 996, quoting United States v. Chancey (11th Cir. 1983) 715 F.2d 543, 546.)  We leave doubts about the credibility of witnesses to the jury " '[e]xcept in ... rare instances of demonstrable falsity....' " (People v. Hovarter, supra, at p. 996, quoting People v. Cudjo (1993) 6 Cal.4th 585, 609.)

In this case we cannot say that the testimony of Smith, an eyewitness whose testimony was not completely inconsistent with that of the other eyewitnesses, was so inherently incredible that no reasonable person would believe his testimony beyond a reasonable doubt.  Moreover, on the critical point of Houston's direction of the conspiracy to rob Bentley, Smith's testimony was corroborated by that of O'Neil.  This was sufficient evidence to support the verdict against him.

People v. George, 2009 WL 1244175, *4-5.

Petitioner has failed to show that viewed in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt based on the evidence introduced at trial.  Petitioner merely states there was not enough evidence and the witnesses who testified were not credible.  As stated in the state court opinion, there was sufficient evidence to find petitioner guilty and petitioner has failed to

1    meet his burden by simply presenting brief conclusory allegations.

2            Whether or not the witnesses were credible was for the jury to decide.  A review

3    of the record indicates that both witnesses, Smith and O'Neil, were cross examined at length and

4    Smith was specifically cross examined regarding his prior lies to the police regarding this

5    incident.  RT at 372-89.  While petitioner was not the main aggressor in the crime, there was

6    sufficient evidence to find him guilty and he has failed to show that the jury's finding was

7    unreasonable.  This claim is denied.

8            Claim 4-Sentencing

9            Finally, petitioner alleges that the trial court erred when it imposed an upper term

10   sentence by relying on a prior offense.

11           Legal Standard

12           In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme

13   Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any

14   fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

15   submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  In Blakely v.

16   Washington, 542 U.S. 296 (2004), the Supreme Court held that the "statutory maximum for

17   Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts

18   reflected in the jury verdict or admitted by the defendant."  Blakely, 542 U.S. at 303.  There is a

19   narrow exception to this rule, however, for enhancements that are based on prior convictions;

20   these need not be submitted to the jury.  See Almendarez-Torres v. United States, 523 U.S. 224,

21   244 (1998) ("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of

22   petitioner's offense would mark an abrupt departure from a longstanding tradition of treating

23   recidivism as 'go[ing] to punishment only.'"); Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008).

24           In People v. Black, 35 Cal. 4th 1238 (2005) ("Black I"), the California Supreme

25   Court held that California's statutory scheme providing for the imposition of an upper term

26   sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  The

18

1   court in Black I reasoned that the discretion afforded to a sentencing judge in choosing a lower,

2   middle or upper term rendered the upper term under California law the "statutory maximum."

3   Black I, 35 Cal. 4th at 1257-61.

4        In Cunningham v. California, 549 U.S. 270 (2007), the United States Supreme

5   Court held that a California judge's imposition of an upper term sentence based on facts found by

6   the judge (other than the fact of a prior conviction) violated the constitutional principles set forth

7   in Apprendi and Blakely. Cunningham expressly disapproved the holding and the reasoning of

8   Black I, finding that the middle term in California's determinate sentencing law was the relevant

9   statutory maximum for purposes of applying Blakely and Apprendi. Cunningham, 549 U.S. at

10  291-94.[34]

11       In light of Cunningham, the Supreme Court vacated Black I and remanded the

12  case to the California Supreme Court for further consideration.  Black v. California, 549 U.S.

13  1190 (2007).  On remand, the California Supreme Court held that "so long as a defendant is

14  eligible for the upper term by virtue of facts that have been established consistently with Sixth

15  Amendment principles, the federal Constitution permits the trial court to rely upon any number

16  of aggravating circumstances in exercising its discretion to select the appropriate term by

17  balancing aggravating and mitigating circumstances, regardless of whether the facts underlying

18  those circumstances have been found to be true by a jury."  People v. Black, 41 Cal. 4th 799, 813

19  (2007) (Black II).  In other words, as long as one aggravating circumstance has been established

20  in a constitutional manner, a defendant's upper term sentence withstands Sixth Amendment

21  challenge.

22

23       [3] The Ninth Circuit subsequently held that Cunningham may be applied retroactively on
    collateral review.  Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).

24       [4] The effect of Cunningham is much dissipated in that the California legislature,
    subsequent to Cunningham, provided that the upper term was the statutory maximum.  See
25  People v. Sandoval, 41 Cal. 4th 825, 845, 62 Cal. Rptr. 3rd 588, 603 (2007).  The court need not
    determine the precise dates of petitioner's sentencing vis-a-vis the effective date of the state
26  statute in that for the reasons stated herein there is no AEDPA violation.

1    Thereafter, relying on Black II, the Ninth Circuit confirmed that, under California

2 law, only one aggravating factor is necessary to authorize an upper term sentence.  Butler v.

3 Curry, 528 F.3d 624, 641-43 (9th Cir. 2008).

4    Analysis

5    This claim was also denied in a reasoned opinion by the state court.

6    [Petitioner] claims the trial court erred in sentencing him to the upper term for
     count one, attempted robbery, on the grounds that he was on probation for a prior
7    offense at the time of the present case and that he was on probation for two other
     misdemeanors involving violence or threat of violence.  He argues the trial court
8    violated his constitutional rights to a jury trial and due process when it sentenced
     him to the upper term without a finding by the jury that the aggravating factors
9    upon which it relied were true.

10   [Petitioner] recognizes that the Supreme Court held in People v. Black (2007) 41
     Cal.4th 799 (Black II) that the fact of a defendant's recidivism is beyond the scope
11   of the jury trial guarantee.  Nevertheless, he raises the issue to preserve it "in
     anticipation of upcoming authority favorable to his position."

12
     In Apprendi v. New Jersey (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 455]
13   (Apprendi), the United States Supreme court held: "Other than the fact of a prior
     conviction, any fact that increases the penalty for a crime beyond the prescribed
14   statutory maximum must be submitted to a jury, and proved beyond a reasonable
     doubt."  The high court extended this rule to California's Determinate Sentencing
15   Law in Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856],
     wherein it held that a defendant's Sixth and Fourteenth Amendment rights to a
16   jury trial were violated when a judge imposed an upper term sentence based on the
     judge's, rather than the jury's, finding of aggravating circumstances.  The court
17   held that the middle term sentence is the maximum sentence a judge may impose
     unless the facts supporting the aggravating circumstances are found true by a jury.
18   (Cunningham, supra, at p. 293 [166 L.Ed.2d at p. 876].)

19   Later, the California Supreme Court decided Black II, supra, in which it reasoned
     that because the existence of a single aggravating circumstance is legally
20   sufficient under California's determinate sentencing scheme to make a defendant
     eligible for the upper term, the existence of a single aggravating circumstance that
21   has been established in accordance with constitutional requirements makes the
     upper term the statutory maximum term.  (Black II, supra, 41 Cal.4th at p. 813.)
22   Accordingly, the court held that, "imposition of the upper term does not infringe
     upon the defendant's constitutional right to jury trial so long as one legally
23   sufficient aggravating circumstance has been found to exist by the jury, has been
     admitted by the defendant, or is justified based upon the defendant's record of
24   prior convictions."  (Id. at p. 816.)

25   For the reasons set forth in Black II there was no constitutional violation in the
     imposition of the upper term for count one, attempted robbery.  "The United
26   States Supreme Court consistently has stated that the right to a jury trial does not

1    apply to the fact of a prior conviction." (Black II, supra, 41 Cal.4th at p. 818.)  In
2    California and elsewhere, courts have interpreted Apprendi to mean that, not only
     is no jury trial required as to the precise fact of a prior conviction, but also no
     right to jury trial exists on matters more broadly described as recidivism.  (People
3    v. McGee (2006) 38 Cal.4th 682, 700-709 and cases cited.)

4    Here, the trial court found [petitioner] was on probation for a violent felony, as
     well as for two other misdemeanor offenses.  This finding, based on [petitioner's]
5    record of prior convictions, made him eligible for an upper term sentence.

6    People v. George, 2009 WL 1244175, *6.

7           Although Butler v. Curry, supra, found that probationary status did not fall within

8    the prior conviction exception to Apprendi, Butler was focused exclusively on Ninth Circuit

9    precedent.  Butler has been found not to apply to an AEDPA context because the Butler holding

10   is not established Supreme Court authority.  Kesee v. Mendoza-Powers, 574 F.3d 675, 679 (9th

11   Cir. 2009).  Again, as was found for the witness immunity claim, the lack of established Supreme

12   Court authority dooms petitioner's Apprendi claim here.  The state courts could rely on

13   petitioner's probationary status at the time he committed the crimes.

14          Accordingly, IT IS HEREBY ORDERED that:

15          1.  Petitioner's application for a writ of habeas corpus is denied.

16          2.  A certificate of appealability shall issue in this action only on the claim of

17   witness immunity.

18   Dated:  December 21, 2011

19                                          /s/ Gregory G. Hollows
                                        UNITED STATES MAGISTRATE JUDGE
     ggh: ab
20   geor3058.hc

21

22

23

24

25

26